NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 260173-U

NOS. 4-26-0173, 4-26-0174 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 13, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* Te. B. and Ti. B., Minors, | ) | Appeal from the |
| (The People of the State of Illinois, | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Livingston County |
| v. | ) | Nos. 21JA20 |
| Karisly A., | ) | 21JA21 |
| Respondent-Appellant). | ) | |
| | ) | Honorable |
| | ) | Mary E. Koll, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Justices Zenoff and Grischow concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's finding that respondent's admission of unfitness was supported by the record was not an abuse of discretion, and its finding that the termination of her parental rights was in her children's best interest was not against the manifest weight of the evidence.

¶ 2    The State filed petitions seeking to terminate respondent Karisly A.'s parental rights as to her minor children Ti. B. and Te. B. (both born in 2017). The trial court found respondent to be unfit and that termination of her parental rights was in the children's best interest, so it granted the petitions and terminated her rights. On appeal, respondent argues that the fitness and best-interest determinations were in error. We affirm.

¶ 3                           I. BACKGROUND

¶ 4                        A. Initial Proceedings

¶ 5    In June 2021, the State filed petitions for adjudication of wardship, which alleged,

in part, that Ti. B. and Te. B. were not receiving the proper or necessary care under section 2-3(1)(a) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(a) (West 2020)) and that they resided in an environment that was injurious to their welfare pursuant to section 2-3(1)(b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(b) (West 2020)). The petition asserted that respondent has mental health issues and a history of engaging in domestic violence with the children's father, Zachary. While the petition also named Zachary, he is not involved in this appeal, so we mention the facts pertaining to him only to the extent they are relevant to respondent. After conducting a shelter-care hearing, the trial court found probable cause for the allegations in the petition. It granted temporary custody of the children to the Illinois Department of Children and Family Services (DCFS).

¶ 6        Following an adjudicatory hearing in October 2021, the trial court found the children abused or neglected under section 2-3(1)(b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(b) (West 2020)) based on an injurious environment in which the "minors were not receiving proper care necessary for their wellbeing in that home had piles of clothing [and] trash [and] hazardous debris throughout." A dispositional hearing was conducted the next month, and at that time, the court made the children wards of the court, reasoning that it was "in the best interest and best for the welfare of the minor(s) and the public because [the] minors were not receiving proper care necessary for their well-being." Respondent was found unfit. A permanency goal was set to return the children home in 12 months. DCFS was ordered to develop and implement a service plan, with which respondent was ordered to cooperate.

¶ 7        The trial court held numerous subsequent permanency review hearings or case management conferences to track respondent's reasonable efforts to regain custody of her children.

¶ 8                    B. Petitions to Terminate Parental Rights

¶ 9        In July 2024, the State filed two petitions to terminate respondent's parental rights with respect to Ti. B. and Te. B., respectively. The petitions alleged two grounds for termination: (1) respondent "has failed to protect the minor[s] from conditions within [their] environment injurious to [their] welfare, pursuant to 750 ILCS 50/1(D)(g) [(West 2024)]" and (2) respondent

"has failed to make reasonable progress toward the return of the minor[s] to her during a nine (9) month period after an adjudication of neglected or abused minor[s] under Section 2-3 of the Juvenile Court Act of 1987, said dates being 10/20/2021 to 07/20/2022 and/or 07/20/2022 to 04/20/2023, and/or 04/20/2023 to 01/20/2024, and/or 10/15/2023 to 07/15/2024, pursuant to 750 ILCS 50/1 (D)(m)(ii) [(West 2024)]."

¶ 10                              C. Fitness Hearing

¶ 11        The fitness hearing commenced in February 2025. The State presented numerous witnesses from the Livingston County Sheriff's Office, who described what they observed when they were dispatched to respondent's residence on five separate occasions over the course of approximately one year.

¶ 12        Specifically, the testimony indicates that on one such occasion, respondent was bleeding from the mouth, reportedly due to Zachary hitting her. A number of the witnesses described a dilapidated home, with trash, grime, glass, plastic, running water, and animal excrement on the floor; signs of neglect, such as children in various levels of undress running around and engaging in dangerous activities, including leaning out of a second-story window; and accusations from Zachary against respondent, including pouring motor oil on him and possessing a knife. On numerous occasions, respondent was observed in a state of mental distress. In one instance, she was holding a child and expressing a desire to cut herself and take her own life as a

result of the overwhelm she was experiencing. On another occasion, she was described as incoherent and "weepy," such that the officer present was concerned for her mental health. On a separate occasion, respondent was taken into custody because the officer on the scene learned she had an outstanding arrest warrant for an unrelated matter. After yet another incident, Zachary called dispatch because a few children had gone missing, and it was later reported that they were found in the garage. The children were often around to witness the police encounters.

¶ 13　　　　After hearing this testimony, the trial court adjourned the fitness hearing. In May 2025, it reconvened for a permanency hearing, at which Janine Boggs, guardian *ad litem* for Ti. B. and Te. B., moved to terminate visitation. Upon the filing of the motion, visitation was suspended pending the court's ruling. The court indicated it would return to the issue after the permanency hearing. Michael Goetz, a foster care manager with the Center for Youth and Family Solutions (CYFS), informed the court that he sees respondent once per month and reported positively on her progress.

¶ 14　　　　The trial court then addressed respondent and noted that she was indeed making progress. The action pertained to two other, younger children (not Ti. B. and Te. B.), and the court found that respondent had made reasonable efforts and progress towards their return home, such that she was fit with respect to them, and the goal changed for them to return home. Though the present appeal does not pertain to these two younger children, we address this portion of the proceeding because the difference in treatment amongst the children has some contextual relevance to Ti. B.'s and Te. B.'s case on appeal.

¶ 15　　　　Indeed, for Ti. B. and Te. B., the trial court found that the goal "should remain substitute care pending determination of termination of parental rights." The court explained the reason for the difference in treatment, noting that "dispositional fitness is specific to each child"

- 4 -

and that "each of these children has their own individual cases. And even though for convenience sake, we combine it all in one order, we certainly could have four separate orders and I could make four specific findings as to each child." The court emphasized the point:

> "That may, again, feel somewhat unfair to you because you are fully cooperating with your service plan. However, because of the situation, what I'm being informed, because of the situation that led to this case being filed and the harm and damage to the children, um, they have not recovered to the point where you would be a possible caregiver for them."

The court then found respondent unfit, but it withheld a judgment as to whether she was also unable, indicating:

> "I understand this is somewhat out of your control now. Initially, there was fault involved. This is not a no-fault case, and you've previously been, or they've previously been adjudicated neglected or abused, whatever the initial allegations were; so, there was fault involved, and you remain unfit to care for [Ti. B. and Te. B.]"

Thus, for Ti. B. and Te. B., the court indicated the goal should remain substitute care while the proceedings on the petition to terminate continued, and the hearing adjourned.

¶ 16 In May 2025, the fitness hearing recommenced. The State began to present additional witnesses, at which time counsel for respondent objected to any testimony about Ti. B.'s and Te. B.'s therapy on the basis of relevance to the issue of parental fitness. The trial court overruled this objection. Respondent's counsel also objected to expert testimony about the cause of the children's diagnoses as outside their area of expertise. The court indicated that it had not yet heard the testimony, noted the objection for the record, and allowed the testimony to proceed.

¶ 17    Rachel Davenport, a psychiatric mental health nurse practitioner at Mason District Hospital, took the stand and testified that she evaluates and diagnoses patients or treats them using medication or therapy and that Te. B. and Ti. B. are amongst her patients. The trial court allowed her to provide testimony as an expert in the field of psychiatric mental health. She proceeded to testify, in relevant part, that Ti. B. and Te. B. met with her on numerous occasions. In these appointments, one or both of them described the following circumstances of their time living with respondent. Specifically, she heard descriptions of respondent slitting the family cat's throat in front of them; not allowing play, going outside, or eating; forcing one or both of them to sleep on the floor; forcing one or both of them to go onto the roof as a means of punishment; brandishing a knife in a threatening manner; and threatening to kill whoever tries to take them away from her. Ti. B. and Te. B. each described nightmares they have. They also reported bed-wetting; flashbacks; fear of being away from their foster parents; and nerves from visits with their biological siblings. During appointments, Davenport observed scratching of the face, hair pulling, and making comments about wanting to kill respondent. She testified that these symptoms were exacerbated by triggers, such as recent visits with their biological siblings. She diagnosed Ti. B. and Te. B. with post-traumatic stress disorder (PTSD) and referred them to lifelong counseling. She further testified that she believes their symptoms of PTSD would worsen if they were around their biological parents and that there was no reason to think this would change in the future. However, their issues have improved, and one of the boys got "Student of the Month" at school.

¶ 18    During cross-examination, Davenport testified regarding the credibility of Ti. B.'s and Te. B.'s recollections of their time living with respondent. Specifically, she indicated that she never spoke with respondent or Zachary to verify what the two children had told her. She also indicated that "sometimes the kids might, you know, exacerbate some of the things, but that does

not mean that they did not experience trauma that is affecting them." She also testified that she had put in her notes that Ti. B. has a history of lying but, as of March 2025, he rarely lies. She indicated that the foster parents have corroborated some aspects of the two children's symptoms, such as their insatiable appetites, behavior at night, and worsened behavior after sibling visits.

¶ 19 Jessica Schoon, who is a licensed clinical social worker and a therapist for North Central Behavioral Systems, also testified. Her testimony was brief, indicating that she saw Ti. B. once per month beginning in August 2024 and that during her appointments, he described respondent as a nightmare and claimed that she had locked him in the basement.

¶ 20 The fitness hearing adjourned. When it recommenced in July 2025, Rebecca Fischer, a behavioral health counselor at North Central Behavioral Health System, took the stand and was permitted by the trial court to testify as an expert in behavioral mental health counseling. Her testimony corroborated or expanded upon much of Davenport's testimony. Specifically, Fischer testified that the children described violence against the family's pet cat; yelling and fighting; hunger; the absence of food; and needles on the ground at respondent's home. Fischer observed PTSD symptoms, such as night terrors, impulsivity, outbursts, intrusive thoughts, and memories of abuse and trauma. Both Ti. B. and Te. B. indicated a dislike for sibling visits because those siblings picked on Te. B. and encouraged them to lie on behalf of their biological parents.

¶ 21 Fischer further indicated that Ti. B.'s trauma was expressed through anger, aggression, and violence, while Te. B.'s trauma was expressed through sadness. More specifically Ti. B. expressed hatred and violent thoughts towards respondent. He had come up with "an elaborate plan that he shared with his brother about killing her and which would help get his dad back into prison." The plan was "to talk his dad into killing his mom so that his mom would be dead and that his dad would be back in prison for sure." He also made violent comments about

wanting to take his mother's eyes out so that she could see how much hurt she's caused. He indicated he had violent thoughts like this once or twice per week, but that they have decreased.

¶ 22　　　　Moreover, Fischer testified that based on their sessions, Te. B. struggled with self-blame and self-hatred, and he engaged in self-harm, including hitting his head against the wall, scratching himself, and pulling his hair. He punched a hole in a wall, had verbal outbursts, and experienced incontinence. Te. B.'s symptoms decreased throughout his time in therapy, but his feelings towards his biological family did not change. He discussed triggers as anything that brings up memories or thoughts, such as locations, words, and phrases.

¶ 23　　　　Additionally, Fischer opined that it would not benefit Ti. B. and Te. B. to see their biological parents and that it would negatively affect their mental health; visits with biological siblings increased their aggression and bad behavior; they still suffer from PTSD and will have a long road to recovery that may last a lifetime; their improvement relates to processing what they have been through rather than reuniting with the parents; and they improve through therapy and feel safe with their foster parents.

¶ 24　　　　Similar to Davenport's cross-examination, Fischer faced a number of questions regarding the credibility of the stories Ti. B. and Te. B. had told her. She confirmed that the stories about violence towards the family pets were first reported by the children's foster parents, who also reported suspected sexual abuse because of Te. B.'s incontinence. She indicated that she is not aware of corroborating evidence of these events, other than what the children told her during individual counseling sessions. She also indicated that Te. B. was seen first, so he brought up these incidents first, and Ti. B. brought them up later, sometimes months later.

¶ 25　　　　Matthew Howard, a sheriff's deputy, then provided testimony concerning calls to the police from respondent's residence made in August 2020 and November 2020. Each call

pertained to Te. B. going missing and subsequently being found.

¶ 26     After this testimony, the hearing adjourned until September 2025, when the trial court reconvened for the fourth day of the fitness hearing. The guardian *ad litem* entered her report as an exhibit. The State entered two exhibits: a copy of convictions and a set of 12 separate service plans.

¶ 27     Respondent expressed a desire to stipulate to the fitness grounds. The trial court then confirmed with her that she wanted to stipulate that the State could prove counts I and II of the petition for termination of parental rights by clear and convincing evidence, such that she would be waiving her right to any further hearing regarding fitness. Respondent agreed, indicated that she had a chance to speak with her attorney, and that there was nothing further she wished to discuss with her attorney about the stipulation. The court described the applicable burden of proof; the allegations in the two counts; and respondent's right to confront the State's witnesses, see and challenge the evidence, and present her own evidence, which she was waiving by stipulation. The court indicated that it also found there to be a sufficient factual basis in support of the stipulation based on all of the evidence presented thus far. The court confirmed with respondent that she was not forced or threatened to stipulate, that she was not promised anything in exchange for her stipulation, that she was not under the influence of anything, and that she understood the decision was permanent. The court then found a knowing and voluntary stipulation to both counts I and II of the petitions to terminate pertaining to both Ti. B. and Te. B.

¶ 28     The trial court turned to addressing Zachary's parental rights, at which point it made a few statements that are relevant to respondent. Specifically, it indicated that before foster care, the children were living in "horrific conditions, not just environmental conditions, but also with really deplorable parenting." The court cited extreme violence between the parents; some evidence

- 9 -

of violence involving the children and pets; and neglect of the residence's conditions and the children's needs. The court also summarized its view of the relationship between respondent and Zachary:

> "My assessment, based on the evidence presented, is that, the picture that's been painted is that [Zachary] was pulling [respondent] down with him, because it's clear that [respondent], when separated from [Zachary], is able to adequately address her mental health issues to properly parent and to safely parent children. But she was being dragged into this horror show, and she allowed that to happen, because when you are a parent, your greatest responsibility is to make sure your children are adequately cared for, and that was not happening."

¶ 29　　During the same hearing, the trial court found that respondent was fit, willing, and able with respect to her two younger children (not Ti. B. and Te. B.). It restored custody and guardianship to her for those two children, citing that she has no more services to complete and no more safety concerns.

¶ 30　　Before concluding the hearing, the trial court indicated that it had reviewed the reports filed in connection with the best interest of Ti. B. and Te. B., which was last updated in September 2025, and which the court described as "all positive." It was also noted that respondent had completed "aftercare."

¶ 31　　　　　　　　　　D. Best-Interest Hearing

¶ 32　　In February 2026, the trial court commenced the best-interest hearing. Amber Watkins, a CYFS caseworker for Ti. B. and Te. B, testified that the children's needs are met by their foster parents, including food, shelter, healthcare, and clothing. They demonstrate comfort discussing their home life, call their foster parents "mom and dad," and ask repeatedly when they

will be adopted by their foster parents. They hug their foster parents frequently and express that they enjoy activities with their foster parents, such as cooking. The foster parents have two other children they have adopted, and Te. B. and Ti. B. consider these two adopted children to be their siblings. The foster family includes Ti. B. and Te. B. in family vacations and outings. Even when Ti. B. and Te. B. make mistakes, the foster parents express love to them and indicate that they are not going anywhere until the case is over. Ti. B. and Te. B. turn to Jessica, their foster mother, for comfort when they are scared or upset.

¶ 33 Next, respondent took the stand on her own behalf and testified that she last saw Ti. B. in January 2023 and Te. B. in March 2023. She has not been offered services to restore visitation, and she was told family counseling was not an option. She was going to have an opportunity to attend a few counseling sessions with them, but the counseling session was canceled after an emergency hearing. She remains ready, willing, and able to engage in that type of therapy and believes that, with services completed, there should be a chance to see Ti. B. and Te. B. and to have a relationship with them. She is aware that they have expressed loathing towards her and a desire to hurt her, but she still believes her parental rights should not be terminated. Regarding her criminal record, she acknowledged that she was charged three times with driving on a suspended license, that she went to court based on a charge of driving under the influence, and that she missed a court date due to an issue with her car.

¶ 34 Ronald, the foster father of Ti. B. and Te. B., testified that he received the children into his care around March 2022, a few months shy of their fifth birthday. During this time, Ronald noticed behaviors that were not consistent with the children's age, such as being nonverbal; wetting their beds; not being fully potty trained; not knowing colors or shapes; not being able to dress themselves; not being able to put their clothes on properly by themselves; not being able to use

- 11 -

eating utensils; and not knowing what a fork was. The children were initially enrolled for three months in a program called Head Start, but the program extended their stay.

¶ 35 Regarding their eating habits, Ronald testified that at restaurants, the children used a fork and spoon but pushed knives away. At the time of Ronald's testimony, the children still had problems with knives. When they first came into Ronald's care in March 2022, they ate with their fingers. They ate a lot and would at times cram food into their mouths until they choked. Te. B. had on occasion taken the bologna off his sandwich, which was packed for school, and put it under his bed, covering it with a paper so the foster parents could not see it. He stated to Ronald that he did this because he was afraid he was not going to get food. It took about six months to a year for Ronald to get the children to change their eating habits.

¶ 36 Furthermore, Ronald testified that the children never wanted to use a car seat and did not enjoy being in the car. When they went out somewhere, they stayed within a few feet of their foster parents and did not lose sight of them to make sure they would be able to return to the home. When court proceedings were ongoing, they got calls from the children's school that they were angry, not listening, and were mean (suggesting that their behavioral issues were the result of triggers related to their biological parents). Similarly, when Ronald first obtained custody of the children, they were still visiting with respondent. Around the time of these visits, personnel from the children's school informed the foster parents that they could always tell when visitation had occurred (again implying that the children's behavior changes during this time). Specifically, Ronald has observed them being mean, angry, and unwilling to listen, but when the visits stopped, they expressed happiness. Ronald further testified that they expressed fear that the court proceedings would result in them being taken away from their foster parents and that respondent would harm Jessica, their foster mother. Ronald testified that he has noticed them appearing

concerned when they hear a car pull up outside of their home.

¶ 37      Moreover, Ronald testified that the children enjoyed being read to, something they said did not happen before their foster placement. They also played games as a foster family, which, again, was something that did not happen before their foster placement. The children did not express a desire to return to their biological family.

¶ 38      In addition to this testimony, the trial court noted that it had the best interest reports and, by agreement of the parties, took judicial notice of the testimony from the four days of the fitness hearing. After hearing the parties' arguments, the court terminated Zachary's rights with respect to the four children. As for respondent, the court restored her guardianship and custody of her two younger children. The court reasoned that she had made significant strides in the last few years, such that she had become a safe parent for those two younger children. However, the court terminated her parental rights with respect to Ti. B. and Te. B. It revisited its reasoning pertaining to fitness, stating that the situation pertaining to those two older children is different because their experiences with respondent were horrific and left them with PTSD. The court noted that unfitness can be based on an environment from before the child was placed into foster care, citing *In re C.W.*, 199 Ill. 2d 198 (2002), as an authority. The court also noted the significance of respondent's stipulation before concluding that, while she has made progress, the harm done to Ti. B. and Te. B. was severe.

¶ 39      The trial court then addressed the best interest factors, indicating that they all weighed in favor of termination. The court specifically drew attention to the fact that Ti. B. and Te. B. had spent half their lives in foster care, during which time they had thrived and had grown "leaps and bounds," despite lagging developmentally. The court referenced their former inability to use car seats and dress themselves; their tendency to hoard food; their fear of knives; and their

fear of their biological parents. It contrasted this situation with the caseworker's description of the excellent care the children receive now and their ability to develop their own unique identities and abilities. They are attached to their foster parents and receive affection from them. The uncontradicted testimony is that they wish to remain with their foster parents, which the court deemed "very significant" given their age. With their foster parents, they have community ties and sibling-like relationships with the foster parents' adopted children. Based on these considerations, the court overall found that the State met its burden regarding the best interest of the children by a preponderance of the evidence, terminated respondent's parental rights, and set the goal as adoption.

¶ 40     This appeal followed.

¶ 41                          II. ANALYSIS

¶ 42     On appeal, respondent argues that the trial court erred in finding that the State proved her unfit by clear and convincing evidence and that it was in the best interest of the child to terminate her parental rights.

¶ 43     Under section 2-29(2) of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2024)), the involuntary termination of parental rights is a two-step process. First, the State must prove by clear and convincing evidence the parent is "unfit," as defined in the Adoption Act. *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). If the State proves unfitness, it then must prove by a preponderance of the evidence that termination of parental rights is in the best interest of the child. *In re D.T.*, 212 Ill. 2d 347, 363-66 (2004).

¶ 44     Before addressing petitioner's arguments, we note that this case involves the allocation of parenting responsibilities. Ill. S. Ct. R. 311(a) (eff. July 1, 2018). In such cases, "[e]xcept for good cause shown, the appellate court shall issue its decision within 150 days after

the filing of the notice of appeal." Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). Because the notice of appeal was filed on February 11, 2026, the 150-day period expired on July 11, 2026. This court granted two extensions of time to file briefs in order for the record to be supplemented, such that the State's responding brief was filed on June 24, 2026. In the absence of a reply from respondent, the case was submitted for decision on July 9, 2026. Since the merits of the appeal were not ready to be addressed until 2 days before the 150-day deadline, we find good cause for issuing this decision after the deadline. See *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 25 n.5 (finding good cause when the briefs were submitted 1 week before the 150-day decision deadline).

¶ 45                              A. Fitness Determination

¶ 46          Respondent does not argue that her stipulation to the fitness determination was made unknowingly or involuntarily. Rather, she argues that though there was evidence presented to support the factual basis underlying the stipulation, it was not of the right type—*i.e.*, that the factual basis pertained to the children's lives before she lost custody and their PTSD, rather than her fitness based on what she did to become a suitable parent, such as completing required services and regaining custody and guardianship over her other children.

¶ 47          A trial court's determination of unfitness is normally reviewed under the manifest weight standard. *In re N.G.*, 2018 IL 121939, ¶ 29. Here, however, the court's finding was made in the context of respondent's admission to unfitness. As such, the court is indeed required to determine whether a factual basis exists for the admission. *In re M.H.*, 196 Ill. 2d 356, 368 (2001). Where, as here, the court concludes that there is a factual basis for the parent's admission of unfitness, its determination is reviewed for an abuse of discretion. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 31. An abuse of discretion " 'occurs when the trial court's ruling is fanciful, unreasonable, or when no reasonable person would adopt [its] view.' " *In re L.S.*, 2014 IL App

- 15 -

(4th) 131119, ¶ 44 (quoting *People v. Taylor*, 2011 IL 110067, ¶ 27).

¶ 48    Here, there were two alleged statutory grounds in the petition to terminate parental rights, only one of which relied on respondent's alleged failure to make reasonable progress during an applicable nine-month period. See 750 ILCS 50/1(D)(m)(ii) (West 2024). The other basis relied on the alleged failure "to protect the minor from conditions within his environment injurious to the minor's welfare." 750 ILCS 50/1(D)(g) (West 2024). Notably, a finding adverse to the parent on any one ground in section 1(D) is sufficient to support a subsequent termination of parental rights. *C.W.*, 199 Ill. 2d at 217 (citing *In re D.D.*, 196 Ill. 2d 405, 422 (2001)). In other words, either one of these grounds was sufficient to support the finding of unfitness.

¶ 49    Respondent's argument on appeal focuses on the sufficiency of the factual basis in relation to the first claim of unfitness (failure to make progress under section 1(D)(m)(ii)) but largely ignores whether it is sufficient for the alternate basis advanced (injurious environment under section 1(D)(g)). But it is the latter section that implicates the problematic home environment that was one of the reasons for the children's removal, which would still exist should the children return to respondent's care, in part because it would exacerbate their PTSD symptoms. As such, the impact of respondent's mere presence around Ti. B. and Te. B. bears significant weight, and the evidence and factual basis regarding these issues was directly on point. The trial court even acknowledged this unique aspect of the case, noting that respondent had made strides in correcting her faults but that there was a no-fault aspect to the case.

¶ 50    Furthermore, we do not overlook that the significant evidence presented in this case is sufficient to support the factual basis before respondent made her stipulation, as the latter occurred only after the evidence was received. This makes this case somewhat unique, as the trial court had the benefit of this evidence, not just a proffer from the State. It heard a considerable

amount of evidence regarding the harrowing conditions Ti. B. and Te. B. experienced in respondent's care and how those conditions led to their PTSD. The rationale that a parent's own presence renders her incapable of protecting her children from experiencing severe PTSD symptoms, regardless of continuing fault on her part, might be dubious in a different case, but it is certainly not in this one. The testimony in this case described numerous brutal, violent, and neglectful incidents while the minors were in respondent's care and a visceral reaction from Ti. B. and Te. B. that expert testimony indicates could last a lifetime. Though credibility concerns were raised about the evidence, we note that the witnesses' testimony was corroborative and respondent chose to stipulate to the allegations after hearing the evidence.

¶ 51    Simply put, respondent caused wounds so deep to these two children that it is unreasonable to expect that she has, or could ever regain, the ability to serve as a fit parent to them. Accordingly, we conclude that the trial court did not abuse its discretion in finding an adequate factual basis to support her admission of unfitness.

¶ 52                    B. Best-Interest Determination

¶ 53    Respondent also contends that the trial court's finding that termination of her parental rights was in Ti. B.'s and Te. B.'s best interest was against the manifest weight of the evidence.

¶ 54    The State must prove by a preponderance of the evidence termination of parental rights is in the minor's best interest. *D.T.*, 212 Ill. 2d at 366. On review, "[w]e will not disturb a court's finding that termination is in the [child's] best interest unless it was against the manifest weight of the evidence." *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005). The applicable factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2024)) are:

"(a) the physical safety and welfare of the child, including food, shelter,

- 17 -

health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals ***;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures, siblings, and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child."

"The court's best interest determination [need not] contain an explicit reference to each of these factors, and a reviewing court need not rely on any basis used by the trial court below in affirming its decision." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.

¶ 55 Here, respondent's specific argument is that "the evidence relating to the minors' familial ties, sibling relationships, identity, and the unique circumstances of this family warranted greater weight in light of respondent's rehabilitation and reunification with two of the minors' siblings." However, "[a] reviewing court is not in a position to reweigh the evidence, but can merely determine if the decision is against the manifest weight of the evidence." See *Tate v. Illinois Pollution Control Board*, 188 Ill. App. 3d 994, 1022 (1989) (citing *Jackson v. Board of Review of Department of Labor*, 105 Ill. 2d 501, 513 (1985)). In a case with evidence pointing in both directions, the appellate court would affirm because of the highly deferential manifest weight standard of review. *In re Custody of H.J.*, 2021 IL App (4th) 200401, ¶¶ 23-24.

¶ 56 Here, there is substantial evidence indicating that it is in Ti. B.'s and Te. B.'s best interest to have respondent's parental rights terminated. The uncontroverted evidence is that while living with their foster parents, their needs have been met, their PTSD symptoms have lessened, and their developmental delays have significantly resolved. The children are now nearly 10 years old, such that the trial court aptly considered their own wishes, which were unequivocally to remain in the care of their foster parents. The evidence strongly supports the conclusion that their association with respondent triggers significant PTSD symptoms and that they have expressed a clear desire not to return to her care. Furthermore, they have expressed dislike of their time with their biological siblings, and in contrast, have positive relationships with their foster parents' adopted children. In light of these circumstances, we cannot conclude that the trial court weighed the applicable factors incorrectly.

¶ 57 Accordingly, the trial court's best-interest determination was not against the manifest weight of the evidence.

¶ 58 III. CONCLUSION

¶ 59   For the reasons stated, we affirm the trial court's judgment.

¶ 60   Affirmed.